**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| GENGHISCOMM HOLDINGS, LLC,<br><br>*Plaintiff*,<br>v.<br><br>SAMSUNG ELECTRONICS AMERICA, INC.,<br><br>*Defendant*. | Case No. 2:24-cv-00901-RWS-RSP<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS


I. INTRODUCTION ........................................ 1

II. THE PERSON HAVING ORDINARY SKILL IN THE ART ........................................ 1

III. CONSTRUCTION OF DISPUTED TERMS AND PHRASES ........................................ 2

A. discrete Fourier transform ('386 Patent, claims 6 and 15) ........................................ 2

B. Preambles of claims 1 and 10 of the '386 Patent ........................................ 3

C. a plurality of codes that are inverse to, complex-conjugate of, or complementary to a set of complex-valued codes ('386 Patent, claims 1 and 10) ........................................ 8

D. a superposition of cyclic-shifted pulse waveforms ('386 Patent, claims 1 and 10) ........................................ 14

E. to shape the OFDM signal into a superposition of cyclic-shifted pulse waveforms ('386 Patent, claims 1 and 10) ........................................ 18

F. converting the OFDM signal to the plurality of frequency-domain values provides for orthogonal frequency division multiple access for the user device and at least one other user device ('386 Patent, claims 8 and 17) ........................................ 19

IV. CONCLUSION ........................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Allen Eng'g Corp. v. Bartell Indus.*,
299 F.3d 1336 (Fed. Cir. 2002)....................21

*Baxalta Inc. v. Genentech, Inc.*,
972 F.3d 1341 (Fed. Cir. 2020)....................12

*Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*,
55 F.3d 615 (Fed. Cir. 1995)....................4

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020)....................5, 7

*Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002)....................5, 6

*Clare v. Chrysler Group LLC*,
819 F.3d 1323 (Fed. Cir. 2016)....................8

*In re Fought*,
941 F.3d 1175 (Fed. Cir. 2019)....................5, 6

*GenghisComm Holdings, LLC v. Samsung Elecs. Am., Inc.*,
Case No. 2:24-cv-00242-RWS-RSP (E.D. Tex.)....................2

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004)....................15

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021)....................15

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)....................8

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)....................1, 14, 15

*Rapoport v. Dement*,
254 F.3d 1053 (Fed. Cir. 2001)....................5

*Shoes by Firebug LLC v. Stride Rite Children's Group, LLC*,
962 F.3d 1362 (Fed. Cir. 2020)....................4, 6

*Trs. Of Columbia Univ. in City of New York v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016)....................21

*Wi-LAN, Inc. v. Apple Inc.*,
811 F.3d 455 (Fed. Cir. 2016)....................20

**Other Authorities**

Lajos Hanzo, *OFDM and MC-CDMA for Broadband Multi-User Communications, WLANs and Broadcasting* (John Wiley & Sons 2003) ....................10, 11

Richard van Nee, *OFDM for Wireless Multimedia Communications* (Artech House 2000)....................11

# TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| 12 | Declaration of Steve Shattil, Under 37 C.F.R. 1.131(a), regarding U.S. Patent No. 11,431,386 (executed May 27, 2025) |
| 13 | Howard Anton & Chris Rorres, *Elementary Linear Algebra: Applications Version* (8th ed. 2000) ("Anton & Rorres") |
| 14 | Lajos Hanzo, *OFDM and MC-CDMA for Broadband Multi-User Communications, WLANs and Broadcasting* (John Wiley & Sons 2003) ("Hanzo") |
| 15 | Richard van Nee, *OFDM for Wireless Multimedia Communications* (Artech House 2000) ("van Nee") |

Defendant Samsung Electronics America, Inc. ("SEA") respectfully submits this Responsive Claim Construction Brief regarding the interpretation of certain claim terms of U.S. Patent No. 11,431,386 ("the '386 Patent"). *See* Dkt. 50-1, Ex. A ('386 Pat.).[1]

## I. INTRODUCTION

There is one patent-in-suit. The parties dispute the meaning of 5 claim terms. SEA's proposed constructions stay true to the language of the claims and reflect the understanding conveyed by the respective patent documents. And, for at least one term, SEA has demonstrated—by clear and convincing evidence—that the claim language chosen by the named inventor and patent agent Mr. Shattil is indefinite.

GenghisComm's proposed constructions, in contrast, rely extensively on an expert declaration and other extrinsic evidence that is not contemporaneous with the alleged invention. That expert declaration and GenghisComm's Opening Brief concedes points that are critical to SEA's showing of indefiniteness including that it is not the claimed "converting" that provides for multiple access by at least two user devices, it is the allocation of the subcarriers among multiple user devices that provides multiple access. GenghisComm's other proposed constructions largely ignore the patent specification and surrounding claim language, and its repeated requests to simply give the disputed claim terms their "plain and ordinary meaning" fails to resolve the parties' dispute about what those terms mean.

## II. THE PERSON HAVING ORDINARY SKILL IN THE ART

Claims are construed from the perspective of a person having ordinary skill in the art at the time of the alleged invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). Plaintiff has presented a declaration indicating that the date of invention was in 2003. Ex.

---

[1] Exhibits A and 1-11 (Dkt. 50-1 to 50-12) were filed by Plaintiff with its Opening Brief. Exhibits 12-15 have been filed contemporaneously with SEA's Responsive Brief.

12. Without agreeing with Plaintiff's characterizations of the facts and for the purposes of claim construction, SEA assumes that this is the date of invention for the purposes of claim construction. The parties offer slightly different opinions about the qualifications of a person of ordinary skill in the art (POSITA), with Plaintiff's proposal resulting in a POSITA with more skill in a narrower field. *Compare* Ex. 1 (Goldburg Decl.), ¶19 *with* Ex. 2 (Mahon Decl.), ¶21. Dr. Mahon's opinion is that a POSITA would have had a master's degree in electrical engineering or a related field, or a bachelor's degree and three years of relevant experience. Ex. 2 (Mahon Decl.), ¶21.

## III. CONSTRUCTION OF DISPUTED TERMS AND PHRASES

### A. discrete Fourier transform ('386 Patent, claims 6 and 15)

| GenghisComm's Position | SEA's Position |
|---|---|
| The Discrete Fourier Transform (DFT) includes its calculation via a Fast Fourier Transform (FFT) | Plain and ordinary meaning |

Based on the specific usage in the claims of the '386 Patent and the written description, SEA does not take issue with the Court's Preliminary Construction of the "discrete Fourier transform" term,[2] as used in the patent-in-suit. SEA continues to maintain that the difference in usage and intrinsic record is of paramount importance in construing this term across different patents with different specifications and claims and does not waive any argument to the contrary as made in the parallel litigation over similar, albeit different patents.

[2] The Preliminary Constructions were issued by the Court the morning of the November 5, 2025 *Markman* hearing in *GenghisComm Holdings, LLC v. Samsung Elecs. Am., Inc.*, Case No. 2:24-cv-00242-RWS-RSP (E.D. Tex.).

### B. Preambles of claims 1 and 10 of the '386 Patent

| Phrase | GenghisComm's Position | SEA's Position |
|---|---|---|
| **Claim 1**: "A method for receiving an Orthogonal Frequency Division Multiplexing (OFDM) signal transmitted by a user device in a wireless network" | The preamble is not a limitation.<br><br>Plain and ordinary meaning.<br><br>Does not require further construction. | The preamble is a limitation.<br><br>Each step recited in the claim must be performed as part of "receiving an [OFDM] signal transmitted by a user device". |
| **Claim 10**: "An apparatus for receiving an Orthogonal Frequency Division Multiplexing (OFDM) signal transmitted by a user device in a wireless network" | The preamble is not a limitation.<br><br>Plain and ordinary meaning.<br><br>Does not require further construction. | The preamble is a limitation.<br><br>The "set of instructions" when executed "by the at least one processor", must cause performance of each step recited in the claim as part of "receiving an [OFDM] signal transmitted by a user device". |

The preambles of claims 1 and 10 are directed to a method (claim 1) and apparatus (claim 10), respectively, that perform the same three steps of "determining", "converting", and "decoding" as part of "receiving an [OFDM] signal transmitted by a user device":

| Claim 1 | Claim 10 |
|---|---|
| 1. A method for receiving **an Orthogonal Frequency Division Multiplexing (OFDM) signal** transmitted by **a user device** in a wireless network, the method comprising: | 10. An apparatus for receiving **an Orthogonal Frequency Division Multiplexing (OFDM) signal** transmitted by **a user device** in a wireless network, the apparatus comprising: |
| | at least one processor; and |
| | a non-transitory computer-readable memory communicatively coupled to the at least one processor, the non-transitory computer-readable memory including a set of instructions stored thereon and executable by the at least one processor for: |
| determining a plurality of subcarrier frequencies allocated to **the user device**; | determining a plurality of subcarrier frequencies allocated to **the user device**; |
| converting **the OFDM signal** to a plurality of frequency-domain values corresponding to the plurality of subcarrier frequencies; and | converting **the OFDM signal** to a plurality of frequency-domain values corresponding to the plurality of subcarrier frequencies; and |
| decoding the plurality of frequency-domain values to recover a plurality of data symbols encoded by **the user device** on the plurality of subcarrier frequencies;<br>wherein decoding employs a plurality of codes that are inverse to, complex-conjugate of, or complementary to a set of complex-valued codes that **the user device** employs to shape **the OFDM signal** into a superposition of cyclic-shifted pulse waveforms that each has one of the plurality of data symbols modulated thereon. | decoding the plurality of frequency-domain values to recover a plurality of data symbols encoded by **the user device** on the plurality of subcarrier frequencies;<br>wherein decoding employs a plurality of codes that are inverse to, complex-conjugate of, or complementary to a set of complex-valued codes that **the user device** employs to shape **the OFDM signal** into a superposition of cyclic-shifted pulse waveforms that each has one of the plurality of data symbols modulated thereon. |

The preambles of claims 1 and 10 are limiting. "[W]hen the claim drafter chooses to use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects." *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995). "[D]ependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention." *Shoes by Firebug LLC v.*

*Stride Rite Children's Group, LLC*, 962 F.3d 1362, 1367 (Fed. Cir. 2020). Similarly, "when the preamble is essential to understand limitations or terms in the claim body, the preamble limits claim scope." *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 807 (Fed. Cir. 2002). Each of these circumstances applies to the preambles here.

GenghisComm does not dispute that the preambles of claims 1 and 10 provide antecedent bases for substantive limitations appearing later in their respective claims. The Federal Circuit has "repeatedly held a preamble limiting when it serves as antecedent basis for a term appearing in the body of a claim." *In re Fought*, 941 F.3d 1175, 1178 (Fed. Cir. 2019). Here, the terms "*the* user device" and "*the* OFDM signal" both find antecedent basis in the preambles, which recite a method or apparatus for "receiving *an Orthogonal Frequency Division Multiplexing (OFDM) signal* transmitted by *a user device* in a wireless network." Ex. A, cls. 1, 10.[3] The antecedent makes clear that the user device is the device that transmits the OFDM signal that is being received. Indeed, as GenghisComm's Opening Brief admits (Dkt. 50 at 20) these claims recite "***A method for receiving***" and "An apparatus ***for receiving***." *See Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1370 (Fed. Cir. 2020) (finding "[a] method for conducting a reaction in plugs in a microfluidic system, comprising the steps of ...." to be limiting where it provided antecedent basis for the body of the claim); *Rapoport v. Dement*, 254 F.3d 1053, 1056, 1059 (Fed. Cir. 2001), (preamble language "[a] method for treatment of sleep apneas comprising administration of a [therapeutically effective regimen]" found limiting because it was necessary to give meaning to the limitation "to a patient in need of such treatment").

The preambles here are also "essential to understand limitations or terms in the claim body." *Catalina Marketing*, 289 F.3d at 807. The first step of the claims requires "determining a

[3] All emphasis to the intrinsic or extrinsic evidence has been added unless otherwise noted.

plurality of subcarrier frequencies allocated to *the user device*." Ex. A, cls. 1, 10. Absent the preamble, it would be unclear what "user device" the body of the claims refers to or that it must transmit an OFDM signal in a wireless network. Likewise, the second step of the claim requires "converting *the OFDM signal* to a plurality of frequency-domain values corresponding to the plurality of subcarrier frequencies." Ex. A, cls. 1, 10. Again, without the preamble, it would be unclear what "OFDM signal" is being converted or that it must be an OFDM signal "transmitted by" the user device. *Id*. Finally, the third step of the claims requires "decoding employs a plurality of codes that are inverse to, complex-conjugate of, or complementary to a set of complex-valued codes that *the user device* employs to shape *the OFDM signal* into a superposition of cyclic-shifted pulse waveforms that each has one of the plurality of data symbols modulated thereon." Ex. A, cls. 1, 10. Again, without the preamble, the claims would not identify the relationship between the codes used for decoding and the codes used by the user device for shaping its transmitted OFDM signal. *Id.* The preambles supply the required antecedent context by specifying that the claimed method and apparatus pertain to "receiving an OFDM signal transmitted by a user device in a wireless network," which in turn anchors the meaning of "the user device," "the OFDM signal," and the shaping codes referenced in the decoding step. *Id.* The preambles here therefore provide necessary context that "give life, meaning, and vitality" to the claims. *Shoes by Firebug*, 962 F.3d at 1367.

GenghisComm's assertion that preambles are not limiting relies exclusively on extrinsic evidence in the form of testimony from their hired expert, Dr. Goldberg. Dkt. 50 at 9-12. But Dr. Goldberg does not and cannot dispute that "the user device" and "the OFDM signal" both find antecedent basis in the preamble. Ex. 1 ¶¶ 23-38. Accordingly, GenghisComm's reliance on extrinsic evidence fails to show the preamble is not limiting. *See, e.g.*, *In re Fought*, 941 F.3d at

1178 (Fed. Cir. 2019); *Bio-Rad Lab'ys*, 967 F.3d at 1371 (body's reliance on preamble for antecedent basis "is a strong indication that the preamble acts as a necessary component of the claimed invention"). Nor does Dr. Goldberg point to any language in the body of the claim that expressly requires that the OFDM signal that is the subject of the claim be "transmitted by" the user device. Ex. 1 ¶¶ 23-38. The words "transmitted by" do not appear anywhere in the body of the claim.

Because the preambles require "receiving an [OFDM] signal transmitted by a user device," the fact that each step recited in the claim must be performed as part of that process necessarily follows. GenghisComm does not dispute as much and merely complains that SEA has not explained "the effect of its proposal on [the] issues in the case." Dkt. 50 at 11. But GenghisComm cites no authority requiring as much, and SEA has complied with the contention and claim construction disclosure requirements of the Local Patent Rules.

### C. a plurality of codes that are inverse to, complex-conjugate of, or complementary to a set of complex-valued codes ('386 Patent, claims 1 and 10)

| GenghisComm's Position | SEA's Position |
|---|---|
| "Complementary codes" should defined to mean:<br><br>"codes that sum to produce a complex-valued WWAN code"<br><br>Otherwise, for the rest of the words, plain and ordinary meaning to a POSITA<br><br>Requires no further construction | Plain and ordinary meaning, with the understanding that:<br><br>a "plurality of codes" are "inverse to" a "set of complex-valued codes" if the product of the "plurality of codes" and the "set of complex-valued codes", when represented as matrices, equals the identity matrix;<br><br>a "plurality of codes" are "complex-conjugate of" a "set of complex-valued codes" if each chip in the "plurality of codes" is a complex value of the form a + bi and a corresponding chip in the "set of complex-valued codes" is a complex value of the form a – bi; and<br><br>a "plurality of codes" are "complementary to" a "set of complex-valued codes" if, for each pair of codes from the plurality of codes and the set of complex-valued codes, the sum of the autocorrelation functions of the codes is equal to zero for all nonzero shifts. |

Because the parties dispute the "plain and ordinary" meaning of the phrase "a plurality of codes that are inverse to, complex-conjugate of, or complementary to a set of complex-valued codes," adopting GenghisComm's proposal to simply give the terms their plain meaning, without more, will not resolve the parties' dispute. "When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008); *accord Clare v. Chrysler Group LLC*, 819 F.3d 1323, 1329-30 (Fed. Cir. 2016) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when . . . reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."). Here, both parties

believe the disputed phrase should be given its plain and ordinary meaning, but they apparently do not agree on what that meaning is.[4] Requiring "no further construction" (partially) as GenghisComm suggests, will not resolve the dispute. And, GenghisComm has not explained why "complementary" should be construed while the other terms should not be. Indeed, as explained below, GenghisComm's construction of "complementary" would subsume both "inverse" and "complex-conjugate" codes entirely and cannot be correct.

Claims 1 and 10 of the '386 Patent require "**decoding** the plurality of frequency-domain values to recover a plurality of data symbols **encoded** by the user device on the plurality of subcarrier frequencies; wherein **decoding** employs ***a plurality of codes that are inverse to, complex-conjugate of, or complementary to a set of complex-valued codes***." Ex. A, cls. 1, 10. As Dr. Mahon explained, "[a] POSITA would understand claims 1 and 10 to involve codes in the context of decoding frequency-domain values to recover data symbols that are encoded by a user device using a set of complex-valued codes." Ex. 2, ¶39. The claims require two sets of multiple codes: "a plurality of codes" used for decoding that have a specific mathematical relationship with—they are either "inverse to," a "complex-conjugate-of," or "complementary to"—a "set of complex-valued codes" used for encoding. Ex. A ('568 Pat.), cls. 1 & 10; Ex. 2 (Mahon Decl.), ¶¶39-41.

The '386 Patent's specification does not define what it means for two sets of codes to be "inverse to," a "complex-conjugate-of," or "complementary to" one another. Ex. 2 (Mahon Decl.), ¶¶45, 48, 55. As Dr. Mahon opines, this would indicate to "a POSITA that the mathematical meaning [of those terms] commonly understood by those in the field applies." *Id.* Citing a linear

[4] GenghisComm opposes adoption of, and thus necessarily disagrees with, SEA's interpretation of the plain and ordinary meaning of the disputed phrase, but GenghisComm does not explain in its brief what it understands the phrase's plain meaning to require. Dkt. 50 at 13-15.

algebra textbook and books concerning OFDM for corroboration, Dr. Mahon then explained the commonly understood meanings of the disputed claim terms to a POSITA, and how they apply in the context of the ’386 Patent claims. Ex. 2 (Mahon Decl.), ¶¶ 41-56.

For the term “inverse to,” Dr. Mahon explained that “a POSITA would recognize the term ‘inverse to,’ in the context of decoding codes and encoding codes, to mean that the decoding codes are the mathematical inverse of the encoding codes.” Ex. 2 (Mahon Decl.), ¶41 (citing Ex. 13, Howard Anton & Chris Rorres, *Elementary Linear Algebra: Applications Version* (8th ed. 2000 (“Anton & Rorres”), at p.41; Ex. 14, Lajos Hanzo, *OFDM and MC-CDMA for Broadband Multi-User Communications, WLANs and Broadcasting* (John Wiley & Sons 2003) (“Hanzo”), at p.438). Dr. Mahon further explained that “[i]t is common to express encoding and decoding codes as matrices.” Ex. 2, ¶41; *see also id.* ¶¶ 42-43. Citing to the Anton & Rorres linear algebra textbook for support, Dr. Mahon concluded that a POSITA would understand the decoding codes and encoding codes, when represented as matrices, are “inverse to” one another if the product of the two matrices “equals the identity matrix.” Ex. 2, ¶44 (citing Ex. 13, Anton & Rorres, p. 41).

GenghisComm does not argue in its brief that any aspect of SEA’s proposed construction of “inverse to” is incorrect. Dkt. 50 at 13-15. Instead, GenghisComm complains that SEA’s construction requires “35 words.” Dkt. 50 at 13, but its declarant Dr. Goldberg needed 77 words to explain what a POSITA would understand “inverse to” to mean in this context. Ex. 1, ¶39. If Dr. Goldburg’s intention is to argue that the plain meaning is reflected in 75 words, GenghisComm should not be heard to complain that SEA’s proposed construction is too long. Dr. Goldberg also agrees that the product of the two matrices used to represent the two code sets would be an “identity matrix” *id.*, and his only critique of SEA’s construction is conclusory. *Id.* at ¶ 40 (opining only

that SEA's proposed construction "does not account for the relative ordering of columns in A and B, nor the transposition operation, nor the possibility that M<N").

For the term "complex-conjugate of," Dr. Mahon explained that "POSITA would have understood that, in the context of the '386 Patent, a 'plurality of codes' are 'complex-conjugate of' a 'set of complex-valued codes' if each chip in the 'plurality of codes' is a complex value of the form a + bi and a corresponding chip in the 'set of complex-valued codes' is a complex value of the form a – bi." Ex. 2, ¶ 48. Here, once more, GenghisComm does not argue that any aspect of SEA's proposed construction of "complex-conjugate of" is incorrect. Dkt. 50 at 13-15. Dr. Goldberg opines, without support, that a POSITA would understand "complex conjugate" to mean that "for each code in the first set, there is a code in the second set whose individual elements ('chips') are complex conjugates of the corresponding elements ('chips') of the corresponding code in the first set." Ex. 1 (Goldberg Decl.), ¶ 41. But reinserting "complex conjugates" back into its own definition is circular and fails to explain what that term means. SEA's proposal is mathematically correct and how a POSITA would have understood the term in the context of the claim language, which indicates that inverse, complex-conjugate, and complementary codes are distinct from each other.

Finally, for "complementary to," Dr. Mahon cited to two textbooks to support his definition that "a POSITA would recognize that the term 'complementary to' means codes that form a complementary pair or set in the mathematical sense, where the sum of their autocorrelation functions is zero everywhere except at zero lag (i.e., for all nonzero shifts)." Ex. 2, ¶ 49 (citing Ex. 14, Hanzo, at pp. 288, 312; Ex. 15, Richard van Nee, *OFDM for Wireless Multimedia Communications* (Artech House 2000) ("van Nee"), at p. 139). SEA's proposal reflects the ordinary and customary meaning of "complementary to" to a POSITA.

GenghisComm's position is unfounded. First, GenghisComm's contention that "[t]he specification provides a definition of 'complementary codes'" (Dkt. 50 at 13) is misplaced. "[T]he standard for lexicography is exacting," and a patentee must "'clearly express an intent' to redefine a term." *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1349 (Fed. Cir. 2020). The language from the specification GenghisComm points to—"[i]n this case, the term complementary means that the coded transmissions corresponding to the code spaces c1, c2, and c3 can sum to produce at least one predetermined WWAN coded data sequence" (Ex. A, 12:20-23)—comes nowhere close to meeting the "exacting" standard for lexicography. Use of the phrase "in this case" shows the patentee was only explaining what "complementary means" in a specific context of an unclaimed embodiment and does not evidence an intent to redefine that term in any use throughout the patent. See *Baxalta*, 972 F.3d at 1349 (use of terms like "such as" confirmed patentee did not redefine disputed claim term). And, the case being described in the specification relied upon by GenghisComm is not the portion of the specification that is even germane to the claims.



FIGURE 1D

Indeed, the claims at issue say nothing about the use of different "code spaces" or the "WLAN group" embodiments that include a "plurality of WTs [wireless terminals] 101-103" that are contemplated by the embodiments illustrated in FIGS. 1C and 1D. Those embodiments require communication between a "WWAN node 119" and three WTs, each of which communicates using a single "code space" that can be summed to produce a "coded data sequence" as is clear from the figure being

described. Here, each WT (101, 102, 103) communicates with the WWAN node 119 using a code c1, c2, or c3. The claims do not use the language "code space" or "coded data sequence." Indeed, the term "coded data sequence" found in the specification implies that it is referring not to the codes themselves, but the data sequence that is coded. Instead of pertaining to the embodiment that GenghisComm identifies relating to its alleged definition of "complementary," the claims instead require "a plurality of codes" that are (among other options) "complementary to" a "set of complex-valued codes" used at a user device to "shape the OFDM signal." Ex. A, 73:7-12, 73:62-67.

Dr. Mahon's unrebutted discussion is in accord. He explains that the language from the specification that GenghisComm relies upon is limited to "the context of multiple 'code spaces' (c1, c2, c3), each existing separately between a wireless wide area network (WWAN) node and three wireless terminals (WTs)." Ex. 2 (Mahon Decl.), ¶51. The language relied upon by GenghisComm "does not define or even reference a relationship between encoding codes and decoding codes" (*id.*), the context in which "complementary" is used in the '386 Patent claims. "[A] POSITA would not look to the uses of 'complementary' in the context of code spaces for guidance on the meaning of 'complementary' as applied to encoding and decoding codes." Ex. 2 (Mahon Decl.), ¶51.

Equally problematic is that GenghisComm's proposed construction for "complementary of"—i.e., "codes that sum to produce a complex-valued WWAN code" is seemingly so broad in isolation that it would subsume both inverse and complex-conjugate codes because any complex-valued codes (whether they be inverse or complex-conjugates) can be summed to produce another complex-valued code. Thus, codes that sum to produce another complex-valued code would render inverse and complex-conjugates superfluous or redundant.

In conclusion, construction of the disputed claim terms is required because the parties dispute what the "plain and ordinary meaning" of "inverse to," "complex-conjugate of," and "complementary to" means. SEA's proposed constructions should be adopted because they adhere to how the terms would be understood by a POSITA in the relevant field, as evidenced by Dr. Mahon's testimony and multiple learned treatises.

**D. a superposition of cyclic-shifted pulse waveforms** ('386 Patent, claims 1 and 10)

| GenghisComm's Position | SEA's Position |
|---|---|
| Plain and ordinary meaning to a POSITA<br><br>Implied requirement of order of operations in "formed from" is not required | A composite signal formed from a summation of a plurality of cyclic-shifted pulse waveforms. |

The '386 Patent makes clear that "a superposition of cyclic-shifted pulse waveforms" is a composite signal formed from a summation of the claimed cyclic-shifted waveforms.

A patent's specification "is the single best guide to the meaning of a disputed term"; "[u]sually, it is dispositive." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*). Here, the specification equates a superposition with a "summation": a "composite signal [] results from a superposition (i.e., summation)." Ex. A ('386 Pat.), 49:11-12; *see also id.* at 49:14-20, 49:45-50, 50:31-32, 52:42-43, 52:48-49, 56:66. As taught in the specification, a summation requires that multiple existent things be summed. *Id.*

"[T]he claims themselves [also] provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Here, in the case of claims 1 and 10, the phrase "a superposition of cyclic-shifted pulse waveforms" requires that multiple existent "cyclic-shifted pulse waveforms" be summed. Ex. A ('386 Pat.), cls. 1 and 10. Claims 1 and 10 also require that

"each [of the cyclic-shifted pulse waveforms] has one of the plurality of data symbols modulated thereon". *Id.*

GenghisComm does not dispute that the claims require a summation resulting in a composite signal. Instead, GenghisComm relies on extrinsic evidence (the testimony of Dr. Goldberg) to argue that a composite signal "can be produced wholly and its entirety in a single modulation step" performed by a Fourier Transform. Dkt. 50 at 16 (citing Ex. 1 (Goldburg Decl.), ¶¶60-61). In his declaration, Dr. Goldberg expands on this argument, stating that:

> From the figure and the specification sections cited above, a POSITA would understand that transmission in the invention encompasses spreading data in the coder by means of a DFT, followed by mapping the spread symbols to subcarrier inputs of an IDFT, followed by simultaneous modulation of all subcarriers by means of that IDFT.

Ex. 1 (Goldburg Decl.), 67.

Equating a composite signal formed from a summation of simultaneously modulated carriers with a summation of "cyclic-shifted pulse waveforms that each has one of the plurality of data symbols modulated thereon" improperly disregards the claim language rendering it meaningless, or superfluous. It is a well-established canon of claim construction that "all claim terms are presumed to have meaning in a claim." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004); *see also Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."). Contrary to GenghisComm's position, claims 1 and 10 do not recite the formation of a composite signal by summing carriers that were individually modulated by one of a plurality of data symbols. Instead, the claims require the prior formation of individual cyclic-shifted pulse waveforms, each bearing its own data symbol, and then summing those already formed and already modulated pulse waveforms to produce the claimed

superposition. Reading the claims to cover a single Fourier Transform step that never generates individual cyclic-shifted pulse waveforms that may be modulated before being summed would render the phrase "cyclic-shifted pulse waveforms" and the requirement that each waveform has a data symbol modulated thereon superfluous.

SEA's proposed construction, on the other hand, is supported by the specification. For example, the '386 Patent explains that a "pulse waveform" is an existent pulse generated from a superposition of carriers:

> A pulse, as used herein, typically refers to a single-pulse waveform generated from a superposition of selected carriers. Pulse waveforms may include a plurality of pulses, such as a pulse train. Delay systems are systems, algorithms, and/or devices adapted to provide time offsets (i.e., phase shifts) to individual carriers to generate carrier superpositions (pulse waveforms).

Ex. A ('386 Pat.), 52:42-46. The '386 Patent further describes modulating a data signal onto pulse waveforms before the pulse waveforms are then summed to generate a composite signal. Ex. A ('386 Pat.), 53:44-46, 55:65-56:7. For example, the '386 Patent explains that:

> A data source 2012 is coupled to at least one of the modules 2014, 2016, and 2020. The pulse generator 2014 may be modulated with data or otherwise adapted to generate information-modulated pulses. **Alternatively**, the subcarrier processing module 2016 may be adapted to **modulate data onto the pulses** or the selected individual carriers. In another embodiment of the invention, the combiner 2020 includes a modulator (not shown) adapted to modulate data symbols from data source 2012 onto the superposition signal.

Ex. A ('386 Pat.), 55:65-56:7. This process of generating pulse waveforms and then modulating those pulse waveforms before summation is not described a single time but is instead repeated throughout the specification, including in another example:

> Alternatively, multiple time-offset pulses are combined wherein **each pulse 2201 to 2209 is generated from a superposition of predetermined subcarriers 2221 to 2229** and **modulated with a corresponding data symbol**. In some cases, time-domain waveforms are provided with frequency-domain processing (e.g.,

> pulse-rate control, rise-time and roll-off control, **pulse shaping**, pulse-width control, frequency-selective filtering, windowing, and/or frequency masking) to **generate pulse waveforms having predetermined spectral characteristics**.
>
> Variations of the disclosed pulse-generation techniques and/or multicarrier-generation techniques, as well as other techniques, may be employed in **generating CI pulse waveforms**. Pulse generators include circuits, systems, software, etc., adapted to generate pulse waveforms. **Pulse generators can also include carrier-generation circuits, systems, software, etc. having some carrier-weighting apparatus or algorithm (e.g., CI coder, phase shifter, delay device, mode-locking system, etc.) adapted to produce a plurality of carriers having complex weights that shape a superposition of the carriers into one or more pulse waveforms.** Since there are many techniques for generating CI waveforms, the invention is not limited to any specific embodiment for generating CI waveforms disclosed herein. Other techniques for generating CI waveforms will be evident to persons skilled in the art.

Ex. A ('386 Pat.), 56:66-57:24; *see also id.*, 49:45-50 (equation for a "transmission" "s(t)" that is equal to a summation of a continuous train of pulses e(t) each modulated by a data symbol), 64:52-55 ("The received signal may be impressed onto the weights, weighted subcarriers, or waveforms generated from one or more superpositions of the weighted subcarriers.").

Viewed against this intrinsic evidentiary backdrop, the disputed claim language is plainly narrower than the broad array of composite-signal formations and data-modulation techniques disclosed in the specification. The claims do not generically invoke a mere "superposition" or "composite signal," nor do they encompass modulating data onto carriers that are subsequently summed. Rather, they expressly recite a precise structure and operational sequence: the user device employs complex-valued codes to shape the OFDM signal "into *a superposition of cyclic-shifted pulse waveforms*," wherein "each" pulse waveform in that "superposition (i.e., summation)" "has one of the plurality of data symbols modulated thereon." Ex. A ('386 Pat.), claims 1, 10, 49:11-12.

In sum, SEA's proposed construction of "a superposition of cyclic-shifted pulse waveforms" adheres to the specification and claim language. GenghisComm's only bicker with SEA's proposed construction—that the words "formed from" imply an order of operations—ignores that a superposition (or summation), by its very nature, requires things to be summed.

### E. to shape the OFDM signal into a superposition of cyclic-shifted pulse waveforms ('386 Patent, claims 1 and 10)

| GenghisComm's Position | SEA's Position |
|---|---|
| Plain and ordinary meaning to a POSITA<br><br>Implied requirement of order of operations in "formed from" is not required | To take the OFDM signal and transform it into a composite signal formed from a summation of a plurality of cyclic-shifted pulse waveforms. |

GenghisComm's only dispute with SEA's position is that "Samsung's added words 'formed,' 'take' and 'transform' in the proposed construction imply a sequence of operations required neither in the claims nor in the specification (nor in OFDM systems in general)." GenghisComm repeats its reliance on extrinsic evidence (the testimony of Dr. Goldberg) to argue that a composite signal "can be produced wholly and its entirety in a single modulation step" performed by a Fourier Transform. Dkt. 50 at 18 (citing Ex. 1 (Goldburg Decl.), ¶¶60-61).

As explained above, GenghisComm's position ignores the surrounding claim language and would render it superfluous. *See supra* § III.D. Claims 1 and 10 do not merely require that a composite signal be produced from an OFDM signal. They require "a superposition of cyclic-shifted pulse waveforms" in which "each" cyclic-shifted pulse waveform "has one of the plurality of data symbols modulated thereon." Ex. A ('386 Pat.), cls. 1 and 10. Reading the claims to cover a single Fourier Transform step that directly produces a composite signal, without ever generating individual cyclic-shifted pulse waveforms that can have data symbols modulated thereon before

being summed, would effectively remove the requirements that there be "cyclic-shifted pulse waveforms" and that "each" such waveform carry a data symbol. *See supra* § III.D.

SEA's proposed construction, by contrast, gives effect to this language and is consistent with the specification. *See supra* § III.D. As discussed above, the '386 Patent describes generating pulse waveforms from superpositions of carriers, modulating data symbols onto those pulse waveforms, and then summing those already generated and already modulated pulse waveforms to form a composite signal. *See supra* § III.D; Ex. A ('386 Pat.), 49:11-12, 49:14-20, 49:45-50, 52:42-46, 55:65-56:7, 56:66-57:24, 64:52-55. In this context, to "shape the OFDM signal into a superposition of cyclic-shifted pulse waveforms" means to take the OFDM signal and transform it into a composite signal formed from a summation of a plurality of cyclic-shifted pulse waveforms, where each cyclic-shifted pulse waveform has one of the plurality of data symbols modulated thereon, as SEA's construction reflects.

### F. **converting the OFDM signal to the plurality of frequency-domain values provides for orthogonal frequency division multiple access for the user device and at least one other user device** ('386 Patent, claims 8 and 17)

| **GenghisComm's Position** | **SEA's Position** |
|---|---|
| Not indefinite<br><br>Plain and ordinary meaning to a POSITA | The full scope of the claim is not reasonably certain and thus this phrase renders the claim indefinite. |

The further limitation on the step and function of "converting the OFDM signal to a plurality of frequency domain values" imposed by dependent claims 8 and 17 render these claims indefinite because the scope of these claims are nonsensical based on the claim language and specification of the '386 Patent. Plaintiff and its declarant, Dr. Goldburg, agree with the fundamental premise of SEA's position: that OFDMA is provided by the *allocation of subcarriers* to different user devices. Dkt. 50 at 19, 20-21; Ex. 1 (Goldburg Decl.), ¶ 77. Dr. Mahon agrees

that the OFDMA is provided by subcarrier allocation—not the claimed "converting" function that is being modified by the dependent claim. Ex. 2 (Mahon Decl.), ¶¶60, 65 ("A POSITA would understand that OFDM modulates data symbols onto orthogonal subcarriers for transmission and that OFDMA extends OFDM by allocating subcarriers to multiple users simultaneously for shared access.").

First, the claim language requires the "converting *the OFDM signal*" functionality to accomplish providing "for orthogonal frequency division multiple access for the user device and at least one other user device." Ex. A ('386 Pat.), 73:36-39, 74:28-31. "[T]he OFDM signal" as recited in the dependent claim refers to "an Orthogonal Frequency Division Multiplexing (OFDM) signal" and "the OFDM signal" found in the independent claims. *See, e.g., Wi-LAN, Inc. v. Apple Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016) ("Subsequent use of the definite articles 'the' or 'said' in a claim refers back to the same term recited earlier in the claim."). The OFDM signal is a signal that is transmitted by "the user device" recited in both the independent and dependent claims. As Dr. Mahon explains, a POSITA would see from the claim language that "the OFDM signal" is created by the "user device." Ex. 2 (Mahon Decl.),¶¶ 61-63.

This result flows from the claim language. For instance, the preambles state that the claimed method or apparatus is "for receiving an [OFDM] signal *transmitted by a user device* in a wireless network . . . ." Ex. A ('386 Pat.), 72:63-65, 73:45-47. The claimed method and apparatus for receiving determines "a plurality of subcarrier frequencies allocated to *the user device*." *Id.*, 72:66-67, 73:54-55. After the OFDM signal is converted to a "plurality of frequency domain values," "decoding" is performed "to recover a plurality of data symbols encoded *by the user device* on the plurality of subcarrier frequencies." *Id.*, 73:4-6, 73:59-61. And, independent claims 1 and 10 require the use of codes for "decoding" that have certain mathematical relationships to

the codes "that the user device employs to shape the OFDM signal into a superposition of cyclic-shifted pulse waveforms that each has one of the data symbols modulated thereon." *Id.*, 73:7-12, 73:62-67. Thus, as Dr. Mahon explains, a POSITA would read "the OFDM signal" of dependent claims 8 and 17 to be produced by one user device. Ex. 2 (Mahon Decl.), ¶ 63 ("The OFDM signal is a time-domain signal received from a user device over a wireless link.").

The "converting" step further refined by claims 8 and 17 requires: "converting the OFDM signal to a plurality of frequency-domain values corresponding to the plurality of subcarrier frequencies." Ex. A ('386 Pat.), 73:1-3, 73:56-58. But,

> A POSITA would not have understood how converting an OFDM signal transmitted by and received from a single user device to produce frequency-domain values 'provides for orthogonal frequency division multiple access for the user device and at least one other device' because only the OFDM signal is converted according to claims 1 and 10 and nothing about claims 8 or 17 change that requirement.

Ex. 2 (Mahon Decl.), ¶64. GenghisComm offers no explanation about how "converting" can provide for OFDMA as required by claims 8 and 17.

Instead of addressing the requirements of the independent claims, GenghisComm focuses on the reception of the signals. Dkt. 50 at 20. GenghisComm further engages in misdirection by arguing that "the method" is not limited to receiving "a signal from a single user device at a time." *Id.* But, that is not the issue. SEA's position does not depend on finding that reception can only occur from "a single user device at a time." Instead, the claim, which requires "converting" the OFDM signal to a plurality of frequency domain values to provide for OFDMA for "the user device and at least one other user device," is "nonsensical in the way a claim to extracting orange juice from apples would be, and are thus indefinite." *Trs. Of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1367 (Fed. Cir. 2016); *see also Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002) ("Accordingly, we conclude as a matter of law that

claims 1-4 and 13, which include the incorrect ‘perpendicular’ limitation, are invalid under § 112, paragraph 2.”). It does not matter whether a base station is “capable of serving multiple simultaneous users.” Dkt. 50 at 20. What matters is whether a POSITA would have understood the converting step to be able to provide for OFDMA as claimed. GenghisComm fails to explain how converting the claimed “OFDM signal” can possibly accomplish this result.

Because claims 8 and 17 are nonsensical and GenghisComm offers no plausible construction of “converting” that presents even a hint of a dispute with Dr. Mahon’s showing that these claims as written are indefinite.

## IV. CONCLUSION

For the foregoing reasons, SEA respectfully requests that the Court adopt its proposed constructions.

Respectfully submitted,

Dated: November 21, 2025

By: <u>*/s/ Andrew R. Sommer*</u>

Melissa R. Smith
State Bar No. 24001351
Email:
melissa@gillamsmithlaw.com
GILLAM & SMITH, LLP
303 S Washington Avenue
Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

Richard Edlin, NY2051696
Email: edlinr@gtlaw.com
Thomas D. Pease NY2671741
Email: thomas.pease@gtlaw.com
Elana B. Araj, NY5280565
Email: elana.araj@gtlaw.com
GREENBERG TRAURIG, LLP
One Vanderbilt Ave
New York, NY 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

Andrew R. Sommer
Virginia Bar No. 70304
Email: sommera@gtlaw.com
GREENBERG TRAURIG LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22102
Telephone: (703) 749-1300
Facsimile: (703) 749-1301

Matthew J. Levinstein, IL6300343
Email: levinsteinm@gtlaw.com
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: (312) 456-1039
Facsimile: (312) 456-8435

Jared Lee (admitted pro hac vice)
Email: Jared.lee@gtlaw.com
GREENBERG TRAURIG, LLP
222 South Main Street, Suite 1730

Salt Lake City, UT 84101
Telephone: (801) 478-6948
Facsimile: (801) 478-6900

**Attorneys for Defendant Samsung Electronics America, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on the November 21, 2025, I caused the foregoing **DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF** to be served on all parties in this action via the Court's CM/ECF system.

*/s/ Melissa R. Smith*
Melissa R. Smith